UNITED STATES of America, Plaintiff–Appellee,

v.

Terrence HALL, Defendant–Appellant.

No. 93–4456.

United States Court of Appeals, Eleventh Circuit.

March 16, 1995.

Joel Hirschhorn, Coral Gables, FL, for appellant.

Kendall B. Coffey, U.S. Atty., Phillip Di-Rosa, Linda Collins Hertz, Lisa T. Rubio, Asst. U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In February, 1993, a jury convicted Terrence Hall, chairman of Bet–Air, Inc., a closely held Miami-based seller of spare aviation parts and supplies of fourteen counts of violating various federal laws in connection with Bet–Air's sale of restricted military equipment parts to Iran. After conviction, the district court sentenced Hall to a prison term of fifty-one months. We affirm.

## FACTS

In June, 1988, Special Agent William T. Parks of the United States Customs Service began investigating allegations that Bet–Air was supplying restricted military parts to Iran. Bet–Air subsequently supplied records in response to two enforcement subpoenas relating to the investigation. On June 27, 1989, Parks and an Assistant United States Attorney met with two attorneys then representing Bet–Air. At the meeting, Bet–Air agreed to voluntarily supply the government with requested corporate minutes within ten days.

On July 3, 1989, Agent Parks entered Bet–Air's property and removed a bag of paper shreddings from a garbage dumpster located near the Bet–Air offices in a parking area reserved for Bet–Air employees. In order to get to the dumpster, Parks had to travel forty yards on a private paved road. No signs indicated that the road was private, and Parks testified that at the time he traveled on the road, he did not know he was on private property. Thus, notwithstanding its location on Bet–Air's private property, the dumpster was readily accessible to the public. One of the reconstructed shredded documents was titled "British Airways—Bet–Air, Inc., Minutes of Meeting." On July 5, 1989, Parks met with Bet–Air's new attorney who provided Parks with the Bet–Air corporate minutes previously requested. Those documents did not include the minutes from the British Airways–Bet–Air meeting. Parks used the shredded documents as the basis for obtaining a search warrant of the Bet–Air premises. Pursuant to the search warrant, Parks and other law enforcement officers seized numerous documents and other records from Bet–Air's premises.

## PROCEDURAL HISTORY

In August, 1990, a federal grand jury in the Southern District of Florida returned a fourteen count indictment against Hall and several codefendants. In April, 1991, Hall moved to suppress all evidence derived from the warrantless search of the garbage dumpster and all evidence seized during the search pursuant to a warrant of the Bet–Air premises.[1] The magistrate judge found that Bet–Air had a "substantially reduced expectation of privacy in the roadway and surrounding area, including the garbage dumpster" and, therefore, recommended that the motion to suppress be denied. The district court adopted the magistrate judge's report and recommendation. Following a jury trial, Hall was convicted as charged on all counts of the indictment and sentenced to a term of fifty-one months imprisonment as to each of the fourteen counts, the sentences to run concurrently with each other. Hall appeals.

## ISSUES

In this appeal, Hall raises the following claims: (1) the district court erred in denying his motion to suppress documents and records seized pursuant to the execution of a search warrant where the probable cause for the warrant was obtained through a warrantless search of a dumpster located in Bet–Air's "curtilage"; (2) the prosecutor's closing remarks were improper and prejudicial; and, (3) the district court improperly exercised its sentencing discretion in applying the Sentencing Guidelines to a pre-Guidelines case.

## CONTENTIONS

Hall contends that Bet–Air had a reasonable expectation of privacy in the shredded documents. He argues that Bet–Air took at least four affirmative measures to safeguard its privacy interest in the documents: the documents were shredded; the documents were sealed inside a green garbage bag; the green garbage bag was placed inside an enclosed garbage dumpster; and the garbage dumpster was within the "commercial curtilage" adjacent to Bet–Air offices forty yards from public property. Hall also argues that Parks's entry onto Bet–Air's premises constituted unauthorized entry onto private property.

The government contends that Bet–Air's subjective expectation of privacy in its garbage was not objectively reasonable because the company did not take steps to limit the public's access to the dumpster. Additional-

---

1. The government conceded that Hall had standing to bring the suppression motion.

ly, the government contends that at the time of the entry, Agent Parks believed the road leading to Bet–Air's premises to be a public road.

## DISCUSSION

### A. Suppression Motion

 We review the district court's denial of a motion to suppress evidence as a mixed question of law and fact. *United States v. Wilson,* 894 F.2d 1245, 1254 (11th Cir.1990). The findings of fact are viewed under the clearly erroneous standard, and the district court's application of the law to those facts is subject to *de novo* review. *Wilson,* 894 F.2d at 1254. The facts are to be construed in the light most favorable to the party who prevailed below. *Wilson,* 894 F.2d at 1254.

In *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Supreme Court held that a warrantless search and seizure of garbage left in a plastic bag on the curb in front of, but outside the curtilage of, a private house did not violate the Fourth Amendment. The Court, relying on *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), held that such a search would only violate the Fourth Amendment if the persons discarding the garbage manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable. *Greenwood,* 486 U.S. at 39, 108 S.Ct. at 1628.

In *Greenwood,* law enforcement officials had on two separate occasions asked the neighborhood's regular trash collector to pick up and turn over to them the plastic garbage bags which had been left on the curb in front of the house in which Greenwood lived. The officers' search of the garbage turned up items consistent with narcotics use. These items formed the basis for affidavits in support of warrants to search Greenwood's home. The police discovered narcotics in both searches, and Greenwood subsequently moved to suppress the evidence as fruits of warrantless searches. The Court found that by disposing of the garbage in opaque plastic bags, Greenwood demonstrated a subjective

expectation of privacy in the discarded garbage. *Greenwood,* 486 U.S. at 39, 108 S.Ct. at 1628. The Court concluded, however, that Greenwood had exposed his garbage to the public sufficiently to render his subjective expectation of privacy objectively unreasonable. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628.

 As support for his assertion that Bet–Air's expectation of privacy in its discarded garbage was objectively reasonable, Hall points to the fact that Parks obtained documents that were shredded, then placed inside a green garbage bag, which was in turn placed inside a garbage dumpster. We believe that the manner in which Bet–Air disposed of its garbage serves only to demonstrate that Bet–Air manifested a subjective expectation of privacy in its discarded garbage. *See Greenwood,* 486 U.S. at 39, 108 S.Ct. at 1628. Whether Park's actions were proscribed by the Fourth Amendment, however, turns on whether society is prepared to accept Bet–Air's subjective expectation of privacy as objectively reasonable. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628.

 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. It is well established that the Fourth Amendment protections apply to commercial premises. "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. Seattle,* 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967). The Fourth Amendment, moreover, "protects people, not places." *Katz,* 389 U.S. at 351, 88 S.Ct. at 511. Thus, whether the Fourth Amendment's protections are invoked to protect the sanctity of the home or of commercial property, the touchstone of the inquiry into the objective reasonableness of an expectation of privacy is whether the governmental intrusion infringes upon the personal and societal values the Fourth Amendment protects. *Oliver v. United States,* 466 U.S.

170, 182–83, 104 S.Ct. 1735, 1743–44, 80 L.Ed.2d 214 (1984).[2]

■ The fact that the test of the legitimacy of an expectation of privacy is the same in both the residential and commercial sphere does not mean, however, that the factors which tend to be of probative value in resolving the inquiry when the governmental intrusion involves a residence, are to be accorded the same weight when the inquiry is directed at the legitimacy of a privacy expectation in commercial property. The Supreme Court's treatment of the expectation of privacy that the owner of commercial property enjoys in such property has differed significantly from the protection accorded an individual's home. *Donovan v. Dewey*, 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2537–38, 69 L.Ed.2d 262 (1981).[3] Such distinctions are inevitable given the fundamental difference in the nature and uses of a residence as opposed to commercial property. These distinctions are drawn into sharp focus when, as in this case, the government intrudes into the area immediately surrounding the structure. In order for persons to preserve Fourth Amendment protection in the area immediately surrounding the residence, they must not conduct an activity or leave an object in the plain view of those outside the area. *See United States v. Dunn*, 480 U.S. 294, 316, 107 S.Ct. 1134, 1147, 94 L.Ed.2d 326 (1987) (Brennan, J., dissenting). The occupant of a commercial building, in contrast, must take the additional

precaution of affirmatively barring the public from the area. The Supreme Court has consistently held that the government is required to obtain a search warrant only when it wishes to search those areas of commercial property from which the public has been excluded. *See Dunn*, 480 U.S. at 316, 107 S.Ct. at 1147 (Brennan, J., dissenting); *See v. Seattle*, 387 U.S. at 545, 87 S.Ct. at 1740.

Whether Bet–Air's subjective expectation of privacy was objectively reasonable, that is, whether Park's actions infringed on any societal values the Fourth Amendment protected, requires, we believe, an inquiry into the nature of the privacy interest asserted and the extent of governmental intrusion. The Supreme Court's teachings in *Greenwood* will guide our inquiry.

Relying on the fact that the dumpster was within the "commercial curtilage" of Bet–Air's property and that it could only be accessed by traveling forty yards on a private road, Hall asserts that the company's subjective expectation of privacy was objectively reasonable. Hall's argument has two parts: Parks's trespass onto private property and the dumpster's proximity to Bet–Air's offices.

■ The dumpster's location on Bet–Air's private property does not contribute significantly to a finding that the company's expectation of privacy was objectively reasonable. Hall's heavy emphasis on Parks's trespass onto Bet–Air's private property is misplaced. The law of trespass forbids intrusions onto

**2.** *Compare Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819, 56 L.Ed.2d 305 (1978) (noting that the Fourth Amendment's protection of commercial property is based upon societal values that have their roots in the origin of the Amendment) *with Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639 (1980) (noting that the Fourth Amendment's respect for the sanctity of the home is based on traditions firmly rooted in the origins of the Republic).

**3.** *Donovan v. Dewey* involved a federal mine inspector's attempt, pursuant to a federal regulation, to conduct a warrantless inspection of a stone quarry. Relying on a line of cases which permits the warrantless inspections of businesses which operate in a pervasively regulated industry, the Court found that the warrantless inspection provision of the regulation did not violate the Fourth Amendment.

Warrantless inspections of businesses have been justified by the need to further urgent federal regulatory interest. *See United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (warrantless inspection of gun dealers); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (permitting warrantless search of retail liquor dealers if authorized by Congress). This deviation from the Fourth Amendment's warrant requirement in the area of pervasively regulated industries stands in stark contrast to the Supreme Court's historical view of the relationship between the Fourth Amendment and the home. As then Justice Rehnquist noted, it is seriously doubtful that Congress could authorize Constitutionally permissible warrantless entries into private residences to further a strong interest in regulating a prohibited activity. *See Donovan v. Dewey*, 452 U.S. 594, 608, 101 S.Ct. 2534, 2543, 69 L.Ed.2d 262 (1981) (Rehnquist, J., concurring).

land that the Fourth Amendment would not proscribe. *See Oliver,* 466 U.S. at 183, 104 S.Ct. at 1743. We note that although the road leading to Bet–Air's dumpster was private, the magistrate judge found that no "objective signs of restricted access such as signs, barricades, and the like" were present. Moreover, the magistrate judge also found that at the time Parks travelled the road, he believed it was a public road. Hall has not come forth with any evidence disputing Parks' assertion. We also note that the Supreme Court has long since uncoupled the application of the Fourth Amendment's protections from the common law doctrine of trespass. The Fourth Amendment's reach does not turn upon the mere presence or absence of physical intrusion into an enclosure. *Katz,* 389 U.S. at 353, 88 S.Ct. at 512.[4] "The existence of a property right is but one element in determining whether expectations of privacy are legitimate." *Oliver,* 466 U.S. at 183, 104 S.Ct. at 1744; *see also Rakas v. Illinois,* 439 U.S. 128, 143, n. 12, 99 S.Ct. 421, 430, n. 12, 58 L.Ed.2d 387 (1978) (noting that "even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon").

As we noted earlier, the owner of commercial property has a reasonable expectation of privacy in those areas immediately surrounding the property only if affirmative steps have been taken to exclude the public. *Greenwood,* moreover, demonstrates that one indicator of the objective reasonableness of an expectation of privacy in discarded garbage is the degree to which persons expose their garbage to the public. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628. We do not read *Greenwood* as measuring the degree of exposure only through reference to that which is in plain view. In *Greenwood,* the Supreme Court considered the extent to which the public had been afforded access to the discarded trash. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628. Admittedly, the Court, in *Greenwood,* was not faced with an intrusion onto private property. As we have already demonstrated, however, the probative value of the fact that the dumpster was located in the area immediately surrounding Bet–Air's property is substantially attenuated due to the lack of any evidence that Bet–Air took steps to exclude the public. Hall argues that the government has not demonstrated that the general public was invited onto Bet–Air's private property. We do not believe this is the appropriate inquiry when an expectation of privacy is asserted in the area immediately surrounding a commercial building. Rather, the Supreme Court has consistently stated that a commercial proprietor has a reasonable expectation of privacy only in those areas where affirmative steps have been taken to exclude the public. *Cf. Air Pollution Variance Bd. of Colo. v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 2115, 40 L.Ed.2d 607 (1974). This failure to exclude the public takes on increased significance when the asserted expectation of privacy is in discarded garbage. The common knowledge that garbage left on the side of a public street is "readily accessible to animals, children, scavengers, snoops and other members of the public" renders an expectation of Fourth Amendment protection unjustified. *Greenwood,* 486 U.S. at 40, 108 S.Ct. at 1628. A commercial proprietor incurs a similarly diminished expectation of privacy when garbage is placed in a dumpster which is located in a parking lot that the business shares with other businesses, and no steps are taken to limit the public's access to the dumpster. It is common knowledge that commercial dumpsters have long been a source of fruitful exploration for scavengers.

Hall's other arguments in support of the objective reasonableness of Bet–Air's expec-

---

**4.** By uncoupling the Fourth Amendment's reach from traditional common law property interests the Court undoubtedly sought to extend the Amendment's coverage. *See Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967) (noting that the Fourth Amendment protections extends further and often have nothing to do with generalized notions of private property and, in any event, protection of property is left primarily to the law of the individual states). In so doing, the Court established that a property interest is neither necessary nor sufficient to invoke Fourth Amendment protection. *See also* Brian J. Serr, Great Expectation of Privacy: A New Model For Fourth Amendment Protection, 73 Minn.L.Rev. 583, 618 (1989).

tation of privacy are unpersuasive. They can be reduced to the assertion that the dumpster was located within the "commercial curtilage" of Bet–Air's property and that a private garbage collection company collected the garbage.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house. . . ." *Dunn*, 480 U.S. at 300, 107 S.Ct. at 1139. The concept of curtilage plays a part in determining the reach of the Fourth Amendment's protections. The Supreme Court used the concept of curtilage in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), to distinguish between the area outside a person's house which the Fourth Amendment protects, and the open fields, which are afforded no Fourth Amendment protection. In general, the curtilage is defined as the area around the home which "harbors those intimate activities associated with domestic life and the privacies of the home." *Dunn*, 480 U.S. at 301 n. 4, 107 S.Ct. at 1140 n. 4.

■ Whether the Fourth Amendment protects privacy interests within the curtilage of a dwelling house depends on four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation. *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139. The Supreme Court has not squarely addressed the applicability of the common law concept of curtilage to commercial property. Given the Court's view of the relationship between the Fourth Amendment and commercial premises, however, we have little doubt that were the Court to embrace the so-called "business curtilage" concept, it would, at a minimum, require that the commercial proprietor take affirmative steps to exclude the public. Such a requirement is apparently foreordained through a long line of case beginning with *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). In light of Bet–Air's failure to exclude the public from the area immediately surrounding its offices, we refuse to apply the so-called "business curtilage" concept in this case.

■ Hall also attempts to distinguish this case from *Greenwood*, pointing out that a private collector handled Bet–Air's garbage. In *Greenwood*, the Court found that the reasonableness of the expectation of privacy was further diminished due to the fact that a garbage collector handled the garbage. *Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628. Hall argues that a conveyance of garbage to a private garbage collector increases the objective reasonableness of Bet–Air's expectation of privacy. We do not read *Greenwood* as attributing any weight to such a distinction. Rather, the Court's reliance on the garbage's conveyance to the garbage collector is properly read as one more example of the fact that a third party was afforded access to the discarded garbage. The Court noted that the garbage collector might have sorted through the garbage or permitted others, including the police, to do so. *Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628. We fail to see how contracting with a private garbage collection service diminishes the probative value of the fact that the garbage was conveyed to a third party. Presumably, both private and public garbage collectors are equally able to sort through the garbage they collect.

Accordingly, we do not believe that Parks infringed upon any societal values the Fourth Amendment protects when he searched Bet–Air's garbage. Bet–Air did not take sufficient steps to restrict the public's access to its discarded garbage; therefore, its subjective expectation of privacy is not one that society is prepared to accept as objectively reasonable.

**B.** *Prosecutorial Misconduct*

■ During the trial, Hall attempted to contradict the government's assertion that he sought to resell military parts when he incorrectly designated them for civilian use. In closing arguments, Hall's lawyer stated that the testimony of a government witness, a former Bet–Air employee, "was that Hall told [the government witness] to return the [restricted military parts], if she could, to the people that Bet–Air had purchased it from."

In the government's rebuttal closing argument, the prosecutor stated:

> if [the jury] can find anywhere in this record ... that [the government witness] was told by Terry Hall to return the goods ... I will faint right here on this floor because it never happened.

Hall's lawyer objected immediately indicating that the transcript of the witness's testimony contradicted the prosecutor's assertion. At the side bar conference, Hall's lawyer presented the district court with a trial transcript which purportedly demonstrated the inaccuracy of the prosecutor's statements. Following the side bar conference, the district court gave a curative instruction and sustained Hall's objection. The district court, complying with the prosecutor's request, instructed the jury that the transcript of the government witness's cross-examination testimony did not support Hall's lawyer's assertion that the prosecutor had misstated the evidence. The district court also instructed the jury that

> [w]hat ... the lawyers say is not evidence ... and ... you, of course, will rely upon your own individual and collective memories as to what was said and not said.

Following the district court's instruction, the prosecutor stated in his rebuttal closing:

> I am telling you and you rely on your own recollection but I am telling you that Knowles never testified nor is there any evidence that Mr. Hall told her to return those goods.

Hall argues that he was denied a fair and impartial trial because the prosecutor's closing statements misstated the evidence and injected the prosecutor's own credibility into the trial. Furthermore, Hall contends the district court's curative instruction exacerbated the error and confirmed the prosecutor's misstatements, thereby prejudicing the jury against him. The government contends that Hall's lawyer contributed to the district court's "misstatement" when he provided the court with the wrong transcript of the government witness's testimony. Additionally, the government claims the evidence fully supported the prosecutor's remarks and that

the witness's testimony did not support the inference Hall sought to draw.

 A prosecutor's statement justifies the reversal of a conviction if it "undermined the fairness of the trial and contributed to a miscarriage of justice." *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir.1990). This court applies a two-part test to claims of prosecutorial misconduct: the challenged statements must be improper, and must have prejudicially affected the defendant's substantial rights. *Obregon*, 893 F.2d at 1310. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome would be different. *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir.1991). Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record. *Obregon*, 893 F.2d at 1310. Our review of this record convinces us that the prosecutor's statements did not undermine the fairness of the trial and did not contribute to a miscarriage of justice.

At the time Hall's lawyer made the objection, he had in his possession a transcript of the cross-examination of the government's witness rather than her redirect testimony which, in fact, contained the language that allegedly would have supported his objection. We have reviewed the witness's redirect testimony and find it ambiguous. We cannot say that it clearly supports the inference that either the government or Hall sought to attach to it. Given this ambiguity, the prosecutor's remarks were not improper. We also do not believe that the prosecutor's remarks served to inject his credibility into the trial. Finally, we find no error in the district court's curative instruction. The district court instructed the jury that the witness's testimony was not in the cross-examination transcript. This statement was entirely accurate: the disputed testimony was in the redirect transcript. We note, moreover, that any confusion which might have existed was entirely attributable to Hall's lawyer when he provided the district court with the wrong transcript.

## C. *Sentencing*

Hall argues that the district court improperly applied the Sentencing Guidelines to this pre-Guidelines case; therefore, it violated the *Ex Post Facto* Clause of Article I, Section 9 of the U.S. Constitution.

We review a district court sentence for an abuse of discretion. *United States v. Funt,* 896 F.2d 1288, 1298 (11th. Cir.1990). A sentence which falls within the range the statute provides generally will not be reviewed on appeal. *Funt,* 896 F.2d at 1298. The sentence the district court imposed was within the statutory limits provided for the crimes of which Hall was convicted.[5] The Guidelines were merely one of several factors which the district court considered in imposing sentencing. Moreover, the district court on several occasions acknowledged that this was a pre-Guidelines case. The district court did not abuse its discretion in imposing sentence.

### CONCLUSION

We find no error in the district court's denial of the suppression motion and the imposition of sentence, nor do we find any impropriety in the prosecutor's closing statements. Accordingly, Hall's convictions and sentences are affirmed.

AFFIRMED.

---

**5.** Hall was sentenced to four years and three months in prison. Title 18 U.S.C. § 371, a violation of which was charged in Count I, permits a maximum sentence of five years imprisonment.

Title 18 U.S.C. § 1001, violations of which were charged in Counts II, III, V through XI, XIII and XIV, permits a maximum sentence of five years imprisonment. Title 22 U.S.C. §§ 2778(b) and (c), violations of which were charged in Counts IV and XII, permits a maximum sentence of ten years of imprisonment.