[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 22, 2005
THOMAS K. KAHN
CLERK

No. 04-11774
Non-Argument Calendar

_____

D. C. Docket No. 03-60057-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFREY FERDINAND BLOCK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 22, 2005)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Jeffrey Ferdinand Block appeals his convictions and sentences for

conspiracy to commit wire and mail fraud, mail fraud, wire fraud, conspiracy to

commit money laundering, and money laundering. After reviewing the record and the arguments of the parties, we **AFFIRM**.

## I. BACKGROUND

Block was indicted for conspiracy to commit wire and mail fraud (Count 1); mail fraud (Counts 63 and 65); wire fraud (Counts 80, 85, 88, 90, 91, 95, 96, and 99); conspiracy to commit money laundering (Count 105); and money laundering (Counts 106-114). At Block's trial, testimony revealed that Block worked with his codefendant, Nicholas Rubbo, at International Foreign Trading Group ("IFTG") and several successor companies (known collectively as "the Rubbo Companies"). Through the Rubbos Companies, Block and Rubbo operated a foreign currency fraud scheme.

In the scheme, the company's salespeople would convince investors to invest in foreign currency options, the option would expire after 35 days, and the company would retain the investor's money. According to Rubbo, the investors were told that the money was sent to a trading house in an offshore account. After the option expired, a certain portion was paid to the salesperson "to make it look legitimate." R15 at 2381. The company provided sales tickets or other documentation to show that the money was invested. Trade or transaction tickets

showed the "strike price," or the price at which the currency would make money for the investors.

According to Rubbo's testimony, Block attended a training session about managing salespeople and the workings of the foreign exchange market. As the sales manager, Block hired, trained, and supervised salespeople for IFTG. He handled customer complaints and explained, when they inquired about their investments, that the strike price had not been reached. Additionally, Block was responsible for setting the strike prices. He also produced false trading tickets that were sent to investors.

According to Rubbo, when the police began investigating IFTG, Rubbo decided to relocate the company to avoid law enforcement. The group also created a new company, International Exchange ("IE"). Rubbo testified that he conducted the same fraudulent operation at IE as at IFTG. After law enforcement officials searched IE, the company moved to another location and changed its name to New World Exchange ("NWE"). When Rubbo learned the Federal Bureau of Investigation ("FBI") was involved in an investigation, he decided to move again and change the company's name, but to incorporate it under someone else's name. Block agreed to put the new business under his name for a larger commission. The

3

new company was called Lamat Investments ("LI"). The LI bank account was in Block's name.

A.      Admission of Documents at Trial

FBI agent Kathleen Antona testified that she was the team leader for the execution of a search warrant on the premises of NWE. Antona testified about the procedure generally followed in the execution of a warrant. According to Antona, agents secure the location, identify the individuals present, and then photograph the entire location before the search is performed. As team leader, Antona monitors the seizures made by the agents, takes possession of items seized, and notes them on an inventory property receipt. The evidence is then transported to an FBI evidence locker. Antona stated that this procedure was followed in the execution of the warrant at NWE. She further testified that Block was on the premises of NWE at the time of the search. According to Antona, the bates stamping on the seized documents indicates their location at the time of the seizure.

Antona identified copies of a property receipt that was filled out and signed at the scene. From examining the property receipt, she testified that Box 10 was seized from the desk designated H-5, which contained business cards for Jeffrey Block, listing his title as vice-president of trading for NWE. She further testified that she could tell the location of a document from the NWE seizure by examining

4

the bates stamp and property receipt. Antona stated that the exhibits were in substantially the same condition as when they were seized.

FBI Special Agent Steffan Nass testified that he participated in the execution of the search warrant at NWE. According to Nass, Block was behind desk H-5 when the agents first entered the room. Nass searched desk H-5 and he found on the desk a display of business cards, which had the name Jeffrey Block and the title vice-president of trading on them. Nass admitted that he did not recollect specifically the documents found, and that he relied on the bate numbers to show the location from which the documents were seized.

John Van Etten, owner of International Legal Imprints ("ILI"), testified that his company provided copying services to the U.S. Attorney's Office in this case. According to Van Etten, ILI is located in locked, secured facility. A code is required to enter its production facility and the storage room is under a separate lock and key. ILI obtained authorization to provide photocopying services to the U.S. Attorney's Office after an inspection of the company's facilities and a criminal background check on its employees. ILI's employees are trained using dummy boxes, which are checked by an experienced staff member.

Van Etten testified that ILI followed its usual procedure in providing copying services to the U.S. Attorney's Office in this case. Either Van Etten or

one of the account managers picked up the documents to be copied and brought them to ILI's facility. Next, the boxes were labeled and taken to the production facility. The pages inside the box were numbered consecutively with any prefixes or other information provided by the U.S. Attorney's Office. After the documents were labeled, ILI's production team made copies of the documents.

According to Van Etten, ILI also followed its standard procedure for labeling documents contained in envelopes. A label was placed on the envelope and each of the documents inside, the documents were returned to the envelope, and the envelope was returned to the box. The production supervisor checked the boxes as the copying was done. Other than adding the bates labels, the documents were not altered. In this case, ILI made two copies of the documents. ILI returned the originals and one set of copies to the U. S. Attorney's Office, and it kept the other set of copies. On cross-examination, Etten admitted that he had no independent proof that ILI's procedures were followed in this case.

The government offered the documents into evidence. Block objected for lack of foundation and no proof of the chain of custody. The district court overruled Block's objections. The district court then instructed the jury:

> [O]ne of the issues in this case is where did certain documents come from. Okay? That is a matter that has to be proved to the jury. So the fact that it has been received into evidence doesn't mean that [t]he

6

Court has passed on that. This is now for you to determine based on what you have heard . . . .

[O]ne of those factual issues that is before the jury . . . is . . . where did the document come from and can the Government prove to you beyond a reasonable doubt that the particular document has reference to a particular Defendant in the case.

R12 at 1781-82.

B.    Closing Arguments

During closing arguments, the prosecutor stated,

They move, they are still conducting the same operation. Why do testify [sic] to change names? Gee, Mr. Block, you left one company and start working for another company with a different name, you look around, all the same people, isn't that kind of suspicious?

R25 at 4799. The prosecutor continued, "[W]hat could anybody working in that company believe when you move and change the name of the corporation . . . looks mighty suspicious." Id. Block reserved a motion for a mistrial and later argued that the prosecutor, in posing a direct question to Block, shifted the burden of proof and implicitly commented on Block's decision not to testify. The district court analyzed the context of the prosecutor's statement and found that the prosecutor merely was suggesting that there were suspicious circumstances and that Block's defense that he did not know about the fraud was not credible. Consequently, the district court denied Block's motion.

7

Additionally, in his closing argument, the prosecutor stated that Block incorporated LI and opened a bank account using his name. The prosecutor argued that Block "is the only one who has powers to withdraw or deposit funds in that account." R25 at 4822. According to the prosecutor, "only Jeffrey Block has authority to move this money. And we all know it is done to facilitate the crime and try to conceal the proceeds, eventually wash it through offshore accounts . . . ." Id. at 4823. Block did not object to these comments.

In his closing argument, Block's attorney, Leonard Fenn, discussed the testimony of witness Charles Stewart. Fenn stated:

> When I asked the question, he responded one way, to the great enjoyment of the Government, and he even referred to it as a slug fest . . . I am not looking up for a fight.
> I hold up the driver's license picture . . . Mr. Stewart, is that Mr. Block? I don't know, I don't have a DNA test. Now, there is a cautious guy . . . . Look at the signatures. Does it look the same? I am not a handwriting expert . . . .
> . . .
> Should that give you some hesitation in accepting everything he said about what Mr. Block did? Doesn't it show some kind of a personal, either animosity, personal bias, something? And who could blame him, he got ripped off. The only guy he could take out his anger on is Mr. Block, and I guess me, but Mr. Block because everybody else is gone.

Id. at 4952-53. During his rebuttal argument, the prosecutor responded to Fenn's argument:

Mr. Fenn complained how Charles Stewart answered his questions, he is still on the attack of Mr. Stewart. Remember I said Charles Stewart in the documents showing in the internal documents he hit a strike price, I said it was a smoking gun. Well, I regret that, I should have said it was a nuclear strike, and that is what it was.

He knew Stewart hurt him bad. On cross examination he was on the attack of Mr. Stewart. Even in the closing argument . . . [Fenn is] trying to show that this is somebody who is not going to be candid in his testimony. . . .

. . . .

Now, a big problem with that argument is that when shown the driver's license photograph, contrary to Mr. Fenn's claim, Mr. Stewart did not try to play fast and loose and try to deny it. He said when shown it, looks like him to me. . . .

. . . .

He is being agreeable. Even that wasn't enough. Twice he said looks like him to me. That wasn't enough for Mr. Fenn. He comes back on the attack, not being satisfied, he said, you can't testify that this is the man sitting in front of you? That is when he said, I don't have DNA or anything. . . .

And then [Fenn] said the Government—slapped his hand a little bit, about speaking objections no matter how well deserved. That is not what the judge said how well deserved, [if] memory serves me correctly, no matter how tempting that might be.

Ladies and gentlemen, he is still on the attack of Mr. Stewart. Mr. Stewart hurt him bad. Mr. Stewart definitively proves the fraud of his client.

R27 at 5077-80. The prosecutor later stated:

Before we leave Mr. Stewart, it wasn't enough for Mr. Fenn to conduct his cross examination in such an aggressive manner, then we have, if you recall this, this was beautiful cross examination by Mr. Schoeppl [co-defendant's counsel].

. . . .

What is their point? They are not going to take his money if he lied about his occupation or didn't disclose what his occupation was? Come on. They had to slap Mr. Stewart around because he was a, one of the nuclear strikes in this case.

Did Mr. Fenn attack the Government agents?
Yes, there is room for improvement in every case. Lashing out at the government agents, this is the evidence that was connecting to his client.

Id. at 5081-82. Block's counsel reserved a motion for mistrial. Id. at 5082. Later, Block's counsel argued that the prosecutor made a "series of personal attacks on my techniques ris[ing] to the level of saying that I had improper and dishonest motives, attacking my credibility without which I cannot properly defend my client." Id. at 5086-87. He contended that the statements rose to the level of impermissible argument because it attributed improper motives to Fenn, as Block's defense lawyer. The district court cautioned the attorneys to avoid attacking the motivations of counsel but found that the prosecutor's arguments had not crossed the line into a personal attack on counsel's tactics.

The jury found Block guilty on all counts.

10

C.      Sentencing

The Presentence Investigation Report ("PSI") calculated Block's base offense level as 6.  With enhancements for the amount of loss, for involvement in a scheme to defraud more than one victim, for committing the offense through mass marketing, for relocation to another jurisdiction to evade law enforcement, for being an organizer or leader of a criminal activity involving five or more participants, Block's total offense level was 31.  Block's criminal history category was calculated to be I.  His guidelines range was 108 to 135 months of imprisonment.

Block filed numerous written objections to the PSI.  He objected, inter alia, to the amount of loss attributed to him.  In response, the government stated that the amount of fraud loss figure was based on an examination of the bank account records for the four Rubbo companies.  The government attached a list of payments to Block from the LI corporate account.  This list shows five withdrawals from the LI account.  Four withdrawals contain black spaces in the "Endorsement" column.  R2-165, Attachment A.  One withdrawal indicates that it was endorsed by "J Block."  Id.  Block did not raise any objection based on Apprendi v. New Jersey, 530 U.S. 466, 476, 120 S. Ct. 2348, 2355 (2000), Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), or any other constitutional ground.

During sentencing, the district court set Block's guidelines range at 97 to 127 months of imprisonment. The district court noted that the crime was "an outright theft" and "a terrible fraud scheme" that caused "substantial" harm to its victims. R31 at 153-54. After stating its intention to impose a sentence within the guidelines, the district court stated that "the conduct in this case was reprehensible," that the defendants "acted not only callously but almost joyfully as they ripped off a person," and that the crime was "really serious activity, and my fear, my concern is that Mr. Block has not learned his lesson." R31 at 156-57. Noting that the consequences to Block were "just and fair," id. at 157, the district court then sentenced Block to 60 months of imprisonment on Counts 1, 63, 65, 80, 85, 88, 90, 91, 95, 96, and 99, and 108 months of imprisonment as to Counts 105 through 114, to be served concurrently. The court also ordered Block to pay joint and several restitution in the amount of $8,158,660.56.

## II. DISCUSSION

Block advances three main arguments on appeal. First, he contends that the district court erred in admitting certain documents because they were not properly authenticated. Second, he avers that the district court abused its discretion by denying Block's motion for a mistrial based on alleged prosecutorial misconduct during closing arguments. Third, he asserts that the district court plainly erred

12

under Booker v. Washington, 543 U.S. ___, 125 S. Ct. 738 (2005), by enhancing his sentence based on facts not charged in the indictment or found by the jury. We review each of Block's arguments in turn.

## A.   Authentication of Documents

We review evidentiary rulings of the district court for clear abuse of discretion. See United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989). Under Federal Rule of Evidence 901, the requirement that evidence be authenticated or identified before admission "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). The rule provides that an example of evidence conforming to this rule is "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." FED. R. EVID. 901(b)(9). Other examples include: "[t]estimony that a matter is what it is claimed to be"; and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." FED. R. EVID. 901(b)(1), (4). We have held that

> [a]uthentication or identification under rule 901 merely involves the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie showing has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be.

13

United States v. Caldwell, 776 F.2d 989, 1001-02 (11th Cir. 1985) (citation and internal quotations omitted). "Use of circumstantial evidence alone to authenticate a document does not constitute error. There is no evidence of adulteration or forgery; thus, there is no reasonable probability of misidentification." Elkins, 885 F.2d at 785 (internal citations omitted). "The decision of whether or not a particular piece of evidence has been appropriately identified falls within the discretionary function of the district court, and that determination will not be disturbed on appeal absent a showing that there is no competent evidence in the record to support it." Caldwell, 776 F.2d at 1001 (citation and internal quotations omitted).

Additionally, we have held that "[c]hallenge to the chain of custody goes to the weight rather than the admissibility of the evidence." United States v. Lopez, 758 F.2d 1517, 1521 (11th Cir. 1985). Once the proponent of the evidence makes a threshold showing that reasonable precautions were taken against alteration of the evidence, the question of whether the evidence was altered is left for the jury to decide. Ballou v. Henri Studios, Inc., 656 F.2d 1147, 1155 (5th Cir. 1981).

In this case, we reject Block's argument that documents seized from NWE were not properly authenticated because the government did not prove that the copying procedure followed by ILI produces an accurate result, as required by

14

Federal Rule of Evidence 901(b). Nass testified that he personally searched and seized documents from Block's desk. Antona testified to the process by which the documents were seized, placed in boxes, numbered, and entered on to the property receipt. She further testified that, from this property receipt, she could identify which box number was seized from which desk. She stated that she could identify the location from which the individual documents were seized by referring to the bates stamp and property receipt. Furthermore, Van Etten explained the bates stamping procedure used by his company, by which the documents inside each box received a stamp with a prefix specifying the box in which they had been placed, and were numbered consecutively. Because this testimony is sufficient to support a finding that the documents in question are what the government claims—documents seized from Block's desk during execution of the search warrant at NWE—the requirement of authentication for the admissibility of this evidence is satisfied. See FED. R. EVID. 901(a). Furthermore, to the extent that Block is arguing that documents were altered or mislabeled by the procedures at ILI, these are chain of custody arguments that go to the weight of the evidence rather than its admissibility. See Lopez, 758 F.2d at 1521. The district court specifically instructed the jury that the fact that the documents had been received into evidence did not mean that the court had determined where the documents

15

were found because the government had to prove to the jury beyond a reasonable doubt "that the particular document has reference to a particular Defendant in the case." R12 at 1781-82. Thus, the district court did not abuse its discretion in admitting the documentary evidence. See Elkins, 885 F.2d at 784 ; Caldwell, 776 F.2d at 1001.

B.     Prosecutorial Misconduct

On appeal, Block contends that the prosecutor committed prosecutorial misconduct by: (1) attacking the integrity and professionalism of Block's counsel because he put forth a "vigorous defense," Appellant's Initial Brief at 20; (2) asking a question directly to Block in his closing argument and thereby commenting implicitly on Block's failure to testify; and (3) misstating the evidence relating to the money laundering charges against Block when he argued in closing argument that Block had sole control over the LI bank account. Consequently, Block argues that he is entitled to a mistrial.

We review a district court's refusal to grant a mistrial for abuse of discretion. See United States v. Knowles, 66 F.3d 1146, 1163 (11th Cir. 1995). A new trial is required for prosecutorial misconduct if we find (1) that a prosecutor's remarks during closing argument were improper, and (2) that they prejudiced the defendant's substantial rights. United States v. Hernandez, 145 F.3d

16

1433, 1438 (11th Cir. 1998).  To assess the prejudicial effect of the prosecutor's

comments, we "evaluate them in the context of the trial as a whole and assess their

probable impact on the jury."  Id.  "A defendant's substantial rights are

prejudicially affected when a reasonable probability arises that, but for the

remarks, the outcome would be different."  United States v. Hall, 47 F.3d 1091,

1098 (11th Cir. 1995).  A prosecutor's personal attacks on defense counsel may

constitute prosecutorial misconduct.  See, e.g., United States v. Young, 470 U.S. 1,

9, 105 S. Ct. 1038, 1043 (1985) (noting that counsel "must not be permitted to

make unfounded and inflammatory attacks on the opposing advocate"); United

States v. Diaz-Carreon, 915 F.2d 951, 958 (5th Cir. 1990) (holding that

prosecutor's remarks that defense counsel was "a zealot in the courtroom," and

"[t]hank God he's a defense attorney and not part of the Government," were

improper).

Additionally, a prosecutor impermissibly comments on the defendant's right

to remain silent where:  "(1) the statement was manifestly intended to be a

comment on the defendant's failure to testify; or (2) the statement was of such a

character that a jury would naturally and necessarily take it to be a comment on the

failure of the accused to testify."  Knowles, 66 F.3d at 1162-63 (citation and

internal quotation omitted).  A remark about the failure of defense counsel, as

17

opposed to the defendant, to counter or explain evidence does not violate the defendant's Fifth Amendment privilege. See id. at 1163; Hernandez, 145 F.3d at 1439. Again, we look at the allegedly improper comment in context so as to discern the prosecutor's motive and evaluate the prejudicial impact of the statement. See Knowles, 66 F.3d at 1163.

In this case, we conclude that the district court correctly denied Block's motion for a mistrial. First, assuming arguendo that the prosecutor improperly attacked Block's attorney in closing arguments, Block's substantial rights were not prejudiced. The government introduced overwhelming evidence of Block's guilt, such as the testimony of his codefendant and former employer, Rubbo, and documentary evidence that Block set the strike prices, handled angry customers, and incorporated LI in his own name following the FBI's search. Accordingly, we conclude the outcome would not have been different had the prosecutor not made the improper attack on Block's counsel. See Hall, 47 F.3d at 1098.

Second, we agree with the district court that the prosecutor's statement that began "Gee, Mr. Block . . . " did not comment impermissibly on Block's failure to testify. When the statement is read in context, it is apparent that the prosecutor was challenging as implausible Block's defense that he did not know that any illegal activities were taking place. See Knowles, 66 F.3d at 1162-63; Hernandez,

18

145 F.3d at 1439. The prosecutor was not commenting on the defendant's failure to testify.

Finally, we conclude that Block's arguments regarding the government's summary of withdrawals from the LI account are without merit. The summary does not show that withdrawals were made by "unknown individuals," Appellants Initial Brief at 22, as Block alleges, and it does not contradict the prosecutor's statements in closing that Block was "the only one that has control over the account." R27 at 5085. Consequently, the district court did not abuse its discretion in denying Block's motions for mistrial.

C.   *Booker* Error

On appeal, Block argues that the district court committed plain error under Booker by enhancing his sentence based on facts not charged in the indictment or found by the jury. He further contends that the error affected his substantial rights in that the district court "explicitly expressed both . . . frustration with the restraints imposed by the guidelines regarding the relative sentences of the co-defendants . . . and that [Block] was being sentenced in accord with the Guidelines." Appellant's Supplemental Brief at 3.[1]

_____

[1] Block also argues that our opinion in United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied, ___ U.S. ___, 125 S. Ct. 2935 (2005), runs contrary to Booker and Eleventh Circuit precedent. We are required to follow Rodriguez under the prior precedent rule. See United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to

Where a defendant fails to raise an objection below, we review for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied, ___ U.S. ___, 125 S. Ct. 2935 (2005). To satisfy the plain-error standard, we must find that (1) the district court committed "error," (2) the error was "plain" or obvious, and (3) the error "affect[ed] substantial rights" in that the error was prejudicial. United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993). If these criteria are met, we have discretion to correct the plain error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations and citation omitted).

Applying Booker, we have held that the first and second prongs of the plain error test are satisfied where "[u]nder a mandatory guidelines system, [a defendant's] sentence was enhanced as a result of findings made by the judge that went beyond the facts admitted by the defendant or found by the jury." Rodriguez, 398 F.3d at 1298. To satisfy the third prong of the plain-error test, a defendant

address an issue of law, unless and until that holding is overruled en banc or by the Supreme Court.").

20

must establish a reasonable probability that if the district court had considered the guidelines range it arrived at using extra-verdict enhancements as merely advisory, instead of mandatory, and had taken into account any otherwise unconsidered [18 U.S.C.] § 3553 factors, the court would have imposed a lesser sentence than it did.

Id. at 1302. If we cannot determine from the record whether the district court would have increased or decreased the defendant's sentence under an advisory guidelines scheme, the defendant has not satisfied this burden. Id. at 1301.

In this case, we conclude that Block has not established that his substantial rights were affected by the district court's Booker error. As Block points out in supplemental briefing, the district court stated that application of the 5K.1 provision "makes you stop and pause" because it results in individuals who exercised less responsibility in a conspiracy, but who did not plead guilty, obtaining higher sentences than those who played major roles, but pleaded guilty. R31 at 131. After making this comment, however, the district court emphasized that it believed that it could exercise discretion to lower Block's sentence but declined to do so based on the facts of this case. Further, the district court denied Block's motion for a downward departure, imposed on Block a sentence in the middle of the guidelines range, and stated that the "consequences" of Block's "reprehensible" conduct were "just and fair." Id. at 156-57. We thus conclude that Block cannot establish a reasonable probability that the district court would have

21

imposed a lesser sentence had it believed the guidelines to be advisory rather than mandatory. Accordingly, we reject Block's argument that the district court committed reversible <u>Booker</u> error, and we affirm Block's sentence.

## III. CONCLUSION

As we have explained, because the government introduced the testimony of the agents who seized the documents, as well as testimony regarding the process by which the documents were seized, bates stamped, and photocopied, the district court did not abuse its discretion in admitting the documentary evidence. In addition, the district court did not abuse its discretion by denying Block's motion for a mistrial because: (1) the prosecutor's comments about Block's counsel did not affect prejudicially Block's substantial rights due to the overwhelming evidence of his guilt; (2) the prosecutor did not impermissibly comment on Block's failure to testify; and (3) the prosecutor did not misstate the evidence in his closing argument. Finally, Block cannot show a reasonable probability that if the district court had considered the guidelines range as merely advisory it would have imposed a lesser sentence. Accordingly, we **AFFIRM**.