Paul L. Maloney, United States District Judge
This matter is before the Court on Defendant Daniel Trevino's motion to suppress evidence obtained by state law enforcement agents on July 3, 2014. The Court held an evidentiary hearing on the motion on August 1, 2019. Now, for the reasons to be explained, the motion will be denied.[1]
I.
Jackson police officer Craig Edmonson was at a Shell station in Jackson, Michigan when he observed what he believed to be a person illegally dumping garbage from a vehicle at a nearby commercial property. Officer Edmonson believed the person was illegally dumping garbage because he knew the property to be vacant, and he had investigated previous complaints from citizens in Jackson of persons illegally dumping garbage.
Edmonson and his partner, a reserve deputy, made their way across the gas station parking lot and across the street, to the property at 800 Wildwood Avenue. There, they encountered a man outside of a van, throwing many plastic bags into the property's garbage receptacles. Officer Edmonson asked the man for identification and asked if he worked at the building. The man-Defendant Daniel Trevino-responded that he owned the building.
Officer Edmonson became suspicious because in his previous experience, he knew the building to be owned by a man he knew as "Ronnie," whom Edmonson claimed owned several properties around Jackson. Trevino also said that he had a key for the building but declined to utilize the key in a door or to open the property on Officer Edmonson's request. Trevino refused to answer most of Edmonson's questions, but did state that he "had been raided 24 times"-something Edmonson found odd, and which triggered his memory from a previous department-wide report regarding an illegal marijuana dispensary which had previously occupied the property in question. Edmonson also frisked Trevino almost immediately, and discovered a bulge in his pocket, which Trevino said was cash. Ultimately, Trevino failed to convince Edmonson that he owned the building, so Edmonson threatened to write him a ticket. Trevino retorted, "Go ahead, it'll get thrown out in court."
*904 After finding a dead end with his questioning of Trevino, Officer Edmonson moved to the other person on the scene, who had remained in the driver's seat of the vehicle. When he made contact, Officer Edmonson smelled marijuana. He learned that the driver was Dolores Lopez and that neither Lopez nor Trevino owned the van they were operating. Lopez also claims that she produced medical marijuana cards and admitted in previous sworn testimony that she had the window down because of the smell of the marijuana radiating from within the van.
During Officer Edmonson's questioning of Lopez, Trevino yelled that Lopez should invoke her right to remain silent. Edmonson thus returned to Trevino and placed him in his squad car. After doing so, he requested that Lopez step out of the vehicle. He then smelled marijuana even more strongly, and he saw several garbage bags towards the rear of the van.
At this point, Edmonson requested guidance from his sergeant and requested that an officer with the Jackson Narcotics Enforcement Team respond to the scene. He also had his partner call the garbage company to inquire as to the owner of the dumpsters he observed Trevino to be using.
Edmonson then searched the van, discovering three large bags of marijuana, which he viewed to be "distribution" level quantities, along with smaller plastic baggies containing remnants of marijuana, eight cell phones, and a Hydroworld political flyer. The officers also searched the garbage containers, revealing more small plastic baggies containing marijuana residue. At this point, officers also seized the money previously discovered on Trevino's person. Ultimately, a JNET officer responded after about a 40-minute delay, and they made the decision to release Trevino, thus ending the police encounter.
Trevino now moves to suppress the evidence seized from his person, from the van, and from the dumpsters at the building for violations of the Fourth Amendment. However, the government renders moot the first issue by declaring that it will not use the cash seized from Trevino's person at trial.
II.
The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. Here, Trevino claims that his Fourth Amendment rights were violated by the officers' search of the dumpster at the property and the search of the vehicle he was using. Because these searches implicate different exceptions to the warrant requirement, the Court will address them separately.
A.
The Court begins with the search of the van. As a preliminary matter, Officer Edmonson's initial encounter with Defendant Trevino did not violate the Fourth Amendment because Edmonson had a reasonable, articulable suspicion that Trevino was engaged in illegal dumping, in violation of a Jackson city ordinance. Courts determine whether a reasonable suspicion exists by looking at the "totality of the circumstances" and considering "all of the information available to law enforcement officials at the time." Feathers v. Aey , 319 F.3d 843, 848-49 (6th Cir. 2003).
Here, Edmonson observed a person (later identified as Trevino) dumping significant quantities of garbage into the dumpster at a commercial building that he believed to be vacant. Edmonson thus had the authority to engage in a Terry stop to further investigate his suspicions of illegal dumping.
*905 Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
However, to qualify as a reasonable seizure, a stop must be limited in scope and duration. Id. Office Edmonson acted reasonably because his initial interaction with Trevino was focused on resolving his suspicion of illegal dumping. He identified Trevino and tried to ascertain whether he had a legal interest in the property which would allow him to dump his garbage in the commercial dumpster. However, Trevino was not interested in proving his ownership of the building and Edmonson soon ran into a dead end. Less than two minutes into their interaction, Edmonson said he'd write Trevino a ticket, and Trevino told him to go ahead, but it would be thrown out.
It was reasonable for Edmonson to continue his investigation by questioning the vehicle's driver, Dolores Lopez, to ask her about Trevino's purported ownership of the property. As soon as Edmonson approached Lopez at the driver-side window, he smelled marijuana, and he related to his partner that he saw a bag in the van which he believed to contain marijuana. He also knew that Trevino had claimed to have been "raided" more than twenty times. Edmonson also learned that the vehicle did not belong to either Trevino or Lopez. Because of this, Edmonson's questioning of Lopez also passes muster under Terry . At this point, less than four minutes had elapsed, and Edmonson was still seeking proof that Trevino had the legal right to dump garbage at the location. It was reasonable to briefly question Lopez to further that investigation.
As Edmonson questioned Lopez, his reasonable suspicion blossomed into full-blown probable cause to believe that the van Trevino and Lopez were using contained marijuana. See Carter v. Parris , 910 F.3d 835, 839 (6th Cir. 2018) ; see also United States v. Elkins , 300 F.3d 638, 659 (6th Cir. 2002) (stating that the odor of marijuana alone was sufficient for probable cause).
Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir.1998) (citations omitted); Smith v. Thornburg, 136 F.3d 1070, 1074 (6th Cir.1998) (citations omitted). Probable cause is defined as " 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.' " Smith, 136 F.3d at 1074 (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990) ). The court's determination of whether probable cause existed at the time of the search is a " 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.' " Id. at 1074-75 (citations omitted). In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the "objective facts known to the officers at the time of the search." Id. at 1075. Probable cause "may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." Lumpkin, 159 F.3d at 986.
The Michigan Medical Marijuana Act does not alter the probable cause analysis, although it may have provided Trevino or Lopez limited immunity from arrest or prosecution, if he or she could prove full compliance with the law. See, e.g. , United States v. Hinds , 2019 WL 1923254 (E.D. Mich. Apr. 30, 2019) ("Whether Hinds was in compliance with the MMMA or not has no bearing on whether probable cause to execute the search existed under the *906 Fourth Amendment."); Johnson v. Williams , No. 14-cv-12790, 2016 WL 1425706, at *2 (E.D. Mich. Apr. 12, 2016) ("[T]he protections of the MMMA do not extend so far as to completely decriminalize the possession and use of marijuana in Michigan, or prohibit searches when a valid MMMA card is a potential defense to arrest or other punishment."); People v. Clark , 2019 WL 3436567 (Mich. Ct. App. July 30, 2019) (reversing trial court suppression order because the smell of marijuana supplied probable cause for the search of the vehicle, despite defendant producing medical marijuana card).
Accordingly, Trevino's motion to suppress the evidence obtained from the van must fail. Officer Edmonson had ample cause to believe that the van contained marijuana based on his sensory observations and his prior knowledge of an illegal dispensary at the location. He was therefore empowered under the automobile exception to search the vehicle and seize the bags of marijuana, the cell phones, and the Hydro World flyer (which although labeled "political flyer" was in close proximity to the bags of marijuana and tied Trevino to Hydro World because it read "Danny Trevino's Hydro World" in bold letters). See United States v. Garcia , 496 F.3d 495, 510 (6th Cir. 2007).
Trevino also makes an alternative argument for suppressing the evidence seized from the van, arguing that it was fruit of the poisonous tree because of an allegedly unlawful pat-down conducted by Edmonson in its first interaction with Trevino. However, even assuming for the sake of argument that the pat-down (which resulted in Edmonson gaining knowledge that Trevino possessed a wad of money) was unconstitutional, it would not change the result here because of the inevitable discovery rule. In other words, no matter whether Edmonson's pat down was unconstitutional, he would have proceeded to engage Lopez in the van, thereby gaining probable cause to believe the vehicle contained marijuana. See, e.g. , United States v. Bost , 606 F. App'x 821, 827-28 (6th Cir. 2015).
B.
The Court will next take up the officer's search and seizure of the dumpsters. Generally, the permissibility of trash searches is governed by the principles set forth in California v. Greenwood , 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In Greenwood , the Court, relying to a large extent on the concurring opinion of Justice Harlan in Katz , held that police do not act in violation of the Fourth Amendment when they obtain, open, and search through trash containers left for collection in an area readily accessible to the public. Id. at 40, 42, 108 S.Ct. 1625. In other words, a person is considered to have forfeited any reasonable expectation of privacy in his trash by knowingly exposing the trash by making it "readily accessible" to the public. Id. ; see also United States v. Bruce , 396 F.3d 697, 709 (6th Cir. 2005) (concluding that hotel occupants had no reasonable expectation of privacy in items placed in trash where they would have been picked up during the routine daily cleaning of hotel room) vacated in part on rehr'g on unrelated grounds , 405 F.3d 1034 (6th Cir. 2005) (mem. op.).
Moreover, proprietors of commercial properties must do more to establish their reasonable expectation of privacy than owners of residential property. See e.g. , United States v. Nwobi , 543 F. Appx. 706, 706 (9th Cir. 2013) (finding that district court, based on the lack of a legitimate expectation of privacy, properly denied the defendant's motion suppress evidence obtained from a commercial waste container "located in a shared *907 parking lot of a business park" when the receptacle "was visible from the street, the gate surrounding the business park was open, and the commercial waste bin was not locked"); United States v. Hall , 47 F.3d 1091, 1096 (11th Cir. 1995) (concluding that defendant did not have a reasonable expectation of privacy in bagged, shredded trash in a garbage dumpster located forty yards down a private road); United States v. Dunkel, 900 F.2d 105, 106 (7th Cir.1990), vacated and remanded on other grounds by Dunkel v. United States, 498 U.S. 1043, 111 S.Ct. 747, 112 L.Ed.2d 768 (1991) (affirming the denial of the defendant's motion to suppress where evidence was retrieved from a common dumpster adjacent to his office building, which "housed two other dentists and five business tenants" and where anyone could walk up to the dumpster); United States v. Skruck , 2014 WL 6883073 (N.D.W.Va. Dec. 4, 2014) (concluding that warrantless search of commercial dumpster did not violate Fourth Amendment as the company failed to take affirmative steps to exclude the public-i.e. by locking the dumpster every night); State v. Yakes, 226 Wis.2d 425, 595 N.W.2d 108, 111-12 (Wis. App. 1999) (finding no reasonable expectation of privacy in a commercial dumpster when access to the dumpster was not restricted and the proprietor allowed others on to the property); State v. Fortune , 28 Kan. App. 2d 559, 568, 20 P.3d 74 (Kan. Ct. App. 2001) ("The police did not infringe upon any societal values protected by the Fourth Amendment when they searched Fortune's trash even though the garbage was located adjacent to his home, was deposited in a private garbage company's lidded container, and was retrieved from the container by police rather than garbage haulers.")
Here, Trevino does not mount an argument relating to the searches of the dumpsters, beyond asserting that "commercial property is protected to the same extent as dwellings in those areas where the public is not invited." See PageID.1135 (citing Dow Chem. Co. v. United States , 476 U.S. 227, 237, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) ).
But that's not quite right (and in fact, it's closer to the opposite). In Dow , the Supreme Court considered dueling lines of cases involving curtilage and the open fields doctrine in the context of an EPA enforcement action, which had included aerial photography of a Dow Chemical plant in Michigan. The Court noted at the outset that "[p]lainly a business establishment or an industrial or commercial facility enjoys certain protections under the Fourth Amendment." Id. at 235, 106 S.Ct. 1819. It then added that Dow clearly had a protectable Fourth Amendment interest in the interior of its covered buildings. Id. It is this language that Trevino apparently relies on to assert that commercial property enjoys the same Fourth Amendment protections as residential property.
However, the real question in Dow was whether exterior property which was elaborately secured but visible from overhead fell into the open fields doctrine or whether it could be considered "industrial curtilage." On this point, the Court noted that the government has "greater latitude to conduct warrantless inspections of commercial property" because "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home." Id. at 237-38, 106 S.Ct. 1819 (quoting Donovan v. Dewey , 452 U.S. 594, 598-599, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) ). The Court then went on to conclude that the taking of aerial photographs of an industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment.
*908 Id. at 239, 106 S.Ct. 1819. In sum then, Trevino's attribution of the holding in Dow is patently incorrect.
Ultimately, the Court concludes that Trevino lacked a reasonable expectation of privacy in the items placed in the dumpster. First, Trevino was not the owner of the dumpster; it was in the name of Dolores Lopez. Second, he testified that he was abandoning the items and would not return for them. In addition, the area where the dumpster was located was very public; it was located along a fence at the edge of the parking lot, only a few feet from a public road. There were no barricades or fences or gates to restrict public access to the dumpster. Likewise, the dumpster appeared to be unlocked, providing easy access to anyone in the area. Under these circumstances, the Court cannot conclude that the search of the dumpster violated Trevino's Fourth Amendment rights because Trevino has not established a legitimate expectation of privacy.
III.
The Court will DENY Trevino's motion to suppress the physical evidence obtained from the search of the vehicle and the dumpsters. The Court will RESERVE on issues related to suppression of Trevino's statements.
ORDER
In accordance with the foregoing opinion, Trevino's motion to suppress is DENIED IN PART . The Court RESERVES its ruling on the admissibility of Trevino's statements.

Trevino's motion references statements he made during the encounter described below that he believes should be suppressed. However, he has not developed any argument in support of this theory. Understandably, the government's response to the motion was also devoid of any mention of Trevino's statements. Based on this posture, the Court finds that the Fifth Amendment issues adverted to by Trevino have not yet been developed, and the Court will RESERVE a ruling on any such statements the government seeks to admit at trial, pending further briefing and argument.